STATE OF CONNECTICUT *v.* ANONYMOUS (1973-7)*

SUPERIOR COURT

MIGNONE, J. The defendant has filed a "Demurrer and/or Motion to Quash" attacking a three-count information charging him with violations of §§ 19-480 (a) and 19-481 (a) of the General Statutes, chapter 359, the Dependency-Producing Drugs Act.

I

The main thrust of the defendant's challenge to this information is the claim that these sections, proscribing the sale, possession or control of a "narcotic substance," are void for vagueness and that, therefore, the defendant has been arrested and

* Opinions on preliminary motions in criminal cases are thus entitled, in view of General Statutes § 54-90.

charged in violation of the fourth, fifth and fourteenth amendments to the United States constitution as well as article first, §§ 8 and 9, of the constitution of Connecticut.

Section 19-480 (a) prohibits, inter alia,. the sale to another person of any controlled substance which is a hallucinogenic substance, amphetamine-type substance, narcotic substance or cannabis-type substance, except as authorized in the act. Section 19-481 (a) makes it a crime for any person to possess or have under his control any quantity of a narcotic substance, except as authorized in the act.

The state's information and its bill of particulars addressed thereto specifically allege that the defendant sold and possessed a narcotic substance, namely, cocaine. The defendant pinions his attack on the claim that cocaine cannot properly be classified as a "narcotic substance" and therefore the information filed is invalid.

Sections 19-480 (a) and 19-481 (a) are part of Public Acts 1972, No. 278, entitled "An Act concerning Revision of the Laws Relating to Controlled Drugs." Section 1 of that act, now set out as § 19-443 of the General Statutes, contains fifty-four subdivisions of definitions applicable to its various provisions. With pregnant significance, in subsection (1) it defines "Abuse of drugs" to mean "the use of controlled substances solely for their stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and not as a therapeutic agent prescribed in the course of medical treatment or in a program of research operated under the direction of a physician or pharmacologist." Other relevant subsections with definitions are (4), "Amphetamine-type drugs"; (5), "Barbiturate-type drugs"; and (7), "Cannabis-type drugs." Subsection (8) is of particular importance because it defines "Controlled drugs" as "those

drugs which contain any quantity of a substance which has been designated as subject to the federal controlled substances act, or which has been designated as a depressant or stimulant drug pursuant to federal food and drug laws, or which has been designated by the public health council and commissioner of consumer protection pursuant to section 19-451, as amended, as having a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and as having a tendency to promote abuse or psychological or physiological dependence, or both. Such controlled drugs are classifiable as amphetamine-type, barbiturate-type, cannabis-type, *cocaine-type,* hallucinogenic, morphine-type and other stimulant and depressant drugs. Specifically excluded from controlled drugs and controlled substances are alcohol, nicotine and caffeine. . . ." (Italics supplied.) Subsection (9) defines a "Controlled substance" to mean "a drug, substance, or immediate precursor in schedule I to V, inclusive of section 19-450a."

Subsection (17) of § 19-443 defines what is included in the term "Drug" as applicable to the act; (18) defines "Drug dependence," and (19), "Drug-dependent person"; (21) refers to the "Federal controlled substances act, 21 USC 801 et seq."; (23) defines "Hallucinogenic drugs," and (29), "Marihuana." Subsection (30) bears special noting since it defines a "Narcotic drug." Part (A) of (30) classifies the "morphine type" drugs—opium and opiate and their derivatives. But it is part (B) of subsection (30) which acquires decisive importance in the instant case because it includes as a "Narcotic drug" "cocaine type" drugs. Subsection (33) defines "Opiate"; (34), "Opium poppy"; (36), "Other stimulant and depressant drugs"; (49), "Restricted drugs or substances"; and (50), "Sale," as applicable to the act.

Part II of chapter 359 of the General Statutes deals with control of dependency-producing drugs. Section 19-450a sets forth five schedules of controlled substances. Subsection (a) contains schedule I. Part (A) of schedule I lists 42 different opiates, including their isomers, esters, ethers, salts and salts of isomers, esters and ethers. Part (B) of schedule I lists 22 opium derivatives, including, inter alia, heroin and morphine. Part (C) of schedule I names 17 controlled substances placed in the category of hallucinogenic substances. It must be noted that "Marihuana" is included in this schedule.

Subsection (b) of § 19-450a contains schedule II, listing numerous "controlled substances." Part (A) of schedule II includes "(1) Opium and opiate, and . . . [their salts and derivatives]; . . . "(4) coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine." Part (B) of schedule II sets forth another group of "opiates" which includes "methadone" and "methadone-intermediate." Part (C) of schedule II lists various substances which have a "potential for abuse associated with a stimulant effect on the central nervous system." Subdivision (1) of this list includes "Amphetamine" and its derivatives.

Section 19-450a of the General Statutes contains other lists of controlled substances, namely, schedule III, in subsection (c); schedule IV in subsection (d); and finally a short list of certain controlled substances in schedule V, in subsection (e). Section 19-452 prohibits, inter alia, the sale of any restricted substance as listed in the various schedules referred to, except as authorized.

It may be helpful to note that Connecticut's Dependency-Producing Drugs Act was originally enacted as Public Acts 1967, No. 555, and various amendments to it were made by the 1969 and 1971 legislatures. But the present sections of chapter 359, dealing with control of drug sale and possession, are based on and followed the enactment of the federal Controlled Substances Act, 21 U.S.C. §§ 801–904 (1970), a subchapter of the Comprehensive Drug Abuse Prevention and Control Act of 1970, of which part D—"Offenses and Penalties"— became effective May 1, 1971.

The 1970 Comprehensive Drug Abuse Prevention and Control Act (21 U.S.C., c. 13) in § 802 (16) defines "narcotic drug" as including: (A) Opium, coca leaves, and opiates. (B) A compound, manufacture, salt, derivative, or preparation of opium, coca leaves, or opiates. (C) A substance (and any compound, manufacture, salt, derivative, or preparation thereof) which is chemically identical with any of the substances referred to in clause (A) or (B). It sets up, in § 812, five schedules of substances controlled under the act, of which schedule II is of particular relevance to the issue of cocaine. Schedule II, like schedule I, includes drugs or other substances which have a high potential for abuse. Schedule II (B) provides, relative to the list of drugs or other substances controlled therein, that "[t]he drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions." And schedule II (C) states that abuse of the drug or other substances may lead to severe psychological or physical dependence.

## II

It is in the context of this background of federal and Connecticut legislation that the defendant's attack must be analyzed and weighed.

The defendant presented as an expert witness Dr. Jonathan Himmelhoch, assistant professor of psychiatry and pharmacology at the Yale Medical School. His qualifications as a medical doctor and psychiatrist are impressive in qualifying him as a pharmacological expert. He has had considerable experience in dealing with drug-dependent persons, as well as the abuse of drugs, at the drug-dependency unit of the Yale-New Haven Hospital and at the Connecticut mental health center. The substance of his extensive testimony resolved itself in a rendition of his opinion that "cocaine is not a 'narcotic substance.'"

Dr. Himmelhoch, in his testimony, relied strongly on the definition of a "narcotic drug" given in Goodman & Gilman, The Pharmacological Basis of Therapeutics (4th Ed.). Chapter 15 of that text contains an article by Dr. Jerome H. Jaffe, associate professor of psychiatry at the University of Chicago, which gives the pharmacological meaning of the medical term "narcotic" as a drug which induces sleep, relieves pain, and produces physical and sometimes psychological dependence and tolerance. Dr. Himmelhoch testified that the drug "opium," derived from the poppy plant, is the natural source of a narcotic. From the raw opium various alkaloids, such as morphine, codeine and others, have been pharmaceutically discovered and prepared, and he pointed out that heroin (diacetylmorphine) is made from morphine. He described in considerable detail the "narcotic action and reactions of the use of these 'true' narcotics, namely, opium, morphine, heroin." His greatest emphasis was placed on the fact that they exert a "narcotic" action which is analgesic and acts as a central nervous system depressant. And he lucidly described the withdrawal symptoms associated with abuse and dependence on "true" narcotics such as heroin.

He then addressed himself to the issue of the classification of cocaine, giving his opinion as an expert that cocaine cannot be truly classed as a narcotic because, pharmacologically, it acts as a stimulant, not as a depressant such as opium, morphine and heroin. He also described the effects of the use of cocaine, the sensations derived from its use, and the attendant withdrawal sensations, as contrasted with the use of morphine and heroin.

All this testimony was of considerable interest from a medical and pharmacological standpoint. But the issue before the court goes beyond the area of the semantics of medical terms.

### III

It is obvious that the state, in enacting the act relating to controlled drugs, following the lead of the federal government, had a specific legislative purpose, namely, the control of the abuse of drugs—whether designated "drugs" or "substances,"—used "solely for their stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and not as a therapeutic agent prescribed in the course of medical treatment." General Statutes § 19-443 (1).

Goodman and Gilman, the medical text relied on by the defendant, at chapter 20 contains a section III entitled "Local Anesthetics." It presents a full discussion of "cocaine, its source, chemistry and pharmacological actions." At page 380 the text states: "Its most striking systemic effect is stimulation of the CNS [central nervous system]." In the discussion of the effect of cocaine on the cardiovascular system, there is, at page 380, a warning that "[t]he administration of a large intravenous dose of cocaine may result in immediate death from cardiac failure due to a direct toxic action on the heart muscle." Dealing, at page 381, with cocaine's

"Absorption, Fate and Excretion," the text states that "[t]he local vasoconstriction caused by cocaine limits the rate of its absorption. Despite this fact, the rate of absorption may easily exceed the rate of detoxification and excretion. Thus, cocaine can be highly toxic." But of greatest significance is the reference at page 381 to "Acute Cocaine Poisoning."

Freeman, "Narcotics Cases: Prosecution and Defense," contains an article entitled "The Drug Abuse Problems and Some Proposals." At page 231, the author, Guy P. Seaberg, in discussing cocaine, points out: "Cocaine, like the amphetamines, is a stimulant. It is similarly non-addicting, in the physical sense, and tolerance to its use does not develop. It is characterized by euphoria and excitement, but may also lead to paranoid delusions unpleasant to the user. It is sometimes used in combination with heroin to produce intensified euphoria without these effects. It is known popularly as the 'speedball' and as such is a commodity of the illicit opiate market. One author claims that 'habitual use of cocaine alone can cause an addict to become epileptic. It can also cause severe brain damage. . . . A mere pinch of the drug . . . turns a docile thief into a killer . . . and murder, instead of simple assault, is the easiest thing in the world.' These are strong accusations. If true, they would seem to indicate that cocaine is the most dangerous drug on the market."

Maloy, The Simplified Medical Dictionary for Lawyers (3d Ed.), contains definitions of "cocainism"—"[a] morbid condition caused by the habitual and excessive use of cocaine as a stimulant or a narcotic"—and "cocainomania": "[i]nsanity with delusions often accompanying cocainism."

A very informative article is McLaughlin, "Cocaine: The History and Regulation of a Danger-

ous Drug," 58 Cornell L. Rev. 537. It discusses in considerable detail the history, use and regulation of cocaine. In its opening paragraphs it makes the arresting observation: "Cocaine has been experiencing a dramatic resurgence of popularity among drug addicts and other drug users. In 1970, the amount of illegal cocaine seized by the federal government surpassed for the first time the amount of heroin seized. A less dramatic but no less discernible increase can be seen in local police statistics. . . . Although long considered a dangerous drug, cocaine has received surprisingly little treatment in the literature on drug abuse." The article discusses (p. 544) the origin of cocaine as an alkaloid extracted from the coca leaf by a chemical process, and its use for medicinal purposes. But (p. 546) "[o]ver the past fifty years, the legitimate use of cocaine has dramatically decreased. First, it became evident that cocaine, although not physically addicting, was highly toxic and could cause some degree of psychological dependence." The article discusses (p. 548) dissimilarities in the importation, distribution and use of cocaine and heroin. It acknowledges (p. 553) that cocaine, pharmacologically speaking, is not a narcotic since it acts as a stimulant, not as a depressant. But it is emphasized that a user of cocaine, although he does not become physically dependent, can develop a psychological or psychic dependence upon it. The article (p. 554) also discusses the toxicity of cocaine. Interestingly, too, it is asserted (p. 555) that the increasing use of cocaine by ex-addicts in methadone maintenance programs has been convincingly documented in recent studies. The ex-addict sells his methadone to purchase cocaine, from the use of which "he can still obtain the pleasurable euphoria of drug taking while running little risk of discovery." And "[s]ince there is no need to inject cocaine, the ex-addict will show no visible signs of his continued drug use."

In part II of his article, McLaughlin reviews the "History of Federal and State Cocaine Regulation." He observes (p. 558) that "[p]rior to 1930, cocaine, rather than heroin or opium, was viewed as the primary drug menace in the United States." And he refers to the predecessor acts of the Comprehensive Drug Abuse Prevention and Control Act of 1970—the 1906 Pure Food and Drug Act (34 Stat. 768 [repealed 1938]) and the passage in 1914 of the Harrison Act (38 Stat. 785 [repealed 1970]) and the Narcotic Drugs Import and Export Act (38 Stat. 275 [repealed 1970]), dealing with cocaine and opium abuse. Again in 1919, it is pointed out (p. 562), the Congress amended (40 Stat. 1130) the Harrison Act "to place even tighter controls on the distribution of cocaine and opium." It is pointed out further (p. 563) that in 1922, in amendments (42 Stat. 596) to the Narcotic Drugs Import and Export Act, "for the first time in a federal statute, cocaine was clearly defined as a narcotic drug. Prior federal statutes had only referred to opium and cocaine by name. Cocaine thus became a narcotic drug in the eyes of the law, whereas pharmacologically it remained a non-narcotic drug." And (p. 564), "[w]ith the 1951 amendments to the Narcotic Drugs Import and Export Act and the Harrison Act [65 Stat. 767], Congress standardized penalties for all drug offenses. Thus the penalty for failing to register as a cocaine distributor became identical to the penalty for illegally importing large quantities of cocaine into the country." These amendments made significant changes in requiring imposition of mandatory prison sentences. Once again, in 1956, the law was amended (70 Stat. 567) to increase the mandatory minimum sentences, although differentiating as to the seriousness of the offense committed. In 1960, the Congress enacted the Narcotics

Manufacturing Act of 1960 (74 Stat. 55 [repealed 1970]), which considerably tightened manufacturing controls on cocaine and other narcotic drugs.

Turning to the history of state legislation regarding cocaine, the article observes (p. 567) that by 1931 "every state had restricted the sale of cocaine and thirty-six had prohibited its unauthorized possession." Later, Connecticut and all other states except two enacted the Uniform Narcotic Drug Act which was proposed in 1932. But the penalties imposed varied from state to state. It appears shocking to learn that under the New York statute, as the article points out (p. 568), "an unauthorized person convicted of selling sixteen ounces of any mixture containing cocaine could be sentenced to life imprisonment." N.Y. Penal Law §§ 70.00, 220.44 (McKinney Sup. 1972).

In the final part of his article, part III, McLaughlin discusses (p. 568) "Present Federal and State Cocaine Regulation." Referring again to the passage of the federal Comprehensive Drug Abuse Prevention and Control Act of 1970, he observes, relative to title II of the act, known as the Controlled Substances Act, that "[w]ith respect to cocaine, the Act changes some of the nomenclature but little of the substance of prior federal law." He alludes (p. 569) to the fact that cocaine "appears in the second schedule of controlled substances—drugs that have a currently accepted medical use but a high potential for abuse that can lead to severe psychological or physical dependence." And he makes the statement (p. 569), most apropos to the instant issue: "Cocaine's designation as a drug with a high potential for abuse is not open to much debate." In final summary he states (p. 572): "Two things are clear from this analysis. First, American drug control legislation has historically treated cocaine not only as a dangerous drug but as a

'peculiarly' dangerous drug. Examples are the unusual legislative classification of cocaine as a narcotic drug despite its pharmacological status as a stimulant and the early felony penalties for cocaine abuse. A strong argument can thus be made that cocaine was viewed as the primary drug menace during the early years of American drug control regulation."

## IV

Prior to the enactment of the federal Comprehensive Drug Abuse Prevention and Control Act of 1970, a number of states had difficulty even with the classification of marihuana. Numerous attacks on the constitutional validity of portions of the federal Controlled Substances Act and of various state laws dealing with drug abuse control have been launched in the recent past. The portions relating to marihuana have borne the major brunt of these attacks. A most comprehensive discussion and persuasive analysis of the problem of the classification of marihuana as a narcotic appears in *People* v. *McCabe*, 49 Ill. 2d 338. The opinion (p. 342) makes an in-depth analysis and comparison of the characteristics and effects of "the drug commonly called marijuana," and points out that the consensus of studies supports the conclusion that the drug abuse characteristics of marihuana cannot be compared with those of the "true narcotic analgesics" such as heroin and morphine. Of particular relevance, however, to the instant issue, the opinion (p. 343) goes on to cocaine, pointing out: "Cocaine, which is placed with marijuana and the opiates in the Narcotic Drug Act, is a powerful stimulant, whereas the morphine-type drugs have a depressing action. Too, cocaine is further unlike the opiates in that it does not have effects of tolerance or physical dependence and abstention does not cause acute withdrawal symptoms. However, because of its

potent nature, it induces intense physical and mental excitation and a marked reduction in normal inhibitions which often results in aggressive and even violent behavior. Intense hallucinations and paranoid delusions are common and, because of this, cocaine users frequently attempt to dilute the experience with a depressant such as heroin or morphine. The properties and consequences of the use of marijuana differ from those attending the use of opiates or cocaine." Particular note must be taken of the conclusion (p. 347): "The compulsion associated with marijuana has been described as moderate or mild. The same is true of the amphetamines. The opiates and cocaine, on the other hand, have a maximal compulsive quality in this regard."

The issue as to marihuana in Illinois, as the court makes clear, became moot, since by the enactment of the Cannabis Control Act (Ill. Rev. Stat. c. 56½ §§ 701–719 [1971]) marihuana was removed from its controversial inclusion in the Narcotic Drug Act (Ill. Rev. Stat. c. 38, §§ 22-1 to 22-49 [1969] [repealed 1971]), and only minor criminal penalties are imposed on a first sale of a small quantity of marihuana.

*State* v. *Zornes,* 78 Wash. 2d 9, 32 (concurring opinion), also pointed out that the Washington legislature recognized the distinction between marihuana and hard narcotics such as "heroin, LSD, opium, morphine, cocaine." The Washington state legislature has changed the definition of marihuana to that of "a dangerous drug," reducing the penalty for the first offense. See *State* v. *Fitzpatrick,* 5 Wash. App. 661; *State* v. *Gerke,* 6 Wash. App. 137; *People* v. *Sinclair,* 389 Mich. 91. These cases make clear that Illinois, Washington and Michigan clearly recognize that marihuana, although subject to state control, should not be classified in the "hard drug" category.

A recent decision in the United States District Court for Connecticut, *United States* v. *Maiden,* 355 F. Sup. 743, 745, discusses the classification of marihuana in schedule I (c) (10) of the federal act (21 U.S.C. § 812 [c]) and emphasizes the precise attention given to marihuana in that act, which establishes a scheme of penalties applicable to that drug only. In that case, also, broad constitutional challenges were made and several eminent doctor-professors testified at great length concerning marihuana as a "relatively mild drug."

Recognizing the anomaly of wide variations in state penalties for possession and sale of drugs, from marihuana on up, the article in 58 Cornell Law Review points out (p. 571) that the "Commissioners on Uniform State Laws drafted the Uniform Controlled Substances Act to provide 'an interlocking trellis of Federal and State law to enable government at all levels to control more effectively the drug abuse problem.' "

The Connecticut Dependency-Producing Drugs Act, amended by Public Acts 1972, No. 278, has followed the federal enactment, not only in part I (as set out in chapter 359 of the General Statutes) as to definitions (See General Statutes § 19-443) but particularly in part II, "Control."

## V

The defendant has restricted his constitutional attack to the claim that the Connecticut drug-dependency statutes do not define what is meant by a "narcotic substance," let alone define "cocaine" as a narcotic substance. His arrest and the charges against him under General Statutes §§ 19-480 (a) and 19-481 (a), concerning sale and possession of cocaine, are, he asserts, void because they violate the fourth, fifth and fourteenth amendments to the

federal constitution as well as article first, §§ 8 and 9, of the Connecticut constitution. The defendant's brief has failed to substantiate this wholesale attack.

The long history of cocaine legislation and control, discussed herein, points up the fact that we have a legislative act enacted for the express purpose of dealing with the abuse of drugs. And the definition in § 19-443 (1) of what is meant by "abuse of drugs" gives meaning and substance to the whole framework of the act as it deals with control. "Abuse of drugs" means "the use of controlled substances solely for their stimulant, depressant or hallucinogenic effect." Even the medical text relied on by the defendant and his expert witness, Dr. Himmelhoch, agrees that cocaine is a stimulant. Numerous other medical authorities uphold the obvious conclusion that cocaine is a stimulant acting on the higher functions of the central nervous system. It can have very serious drug abuse results on the habitual user who does not use this drug as a properly prescribed therapeutic agent.

None of the authorities cited in the defendant's brief give valid support to the constitutional claims he has raised. The statute is abundantly clear in setting forth its objectives and scope. And giving the defendant every benefit of the accepted rule of statutory construction that criminal statutes are to be strictly construed, he has not sustained his burden of proof that the statutes involved are so constitutionally vague as to force the court to hold that they are invalid.

As the state's brief makes clear, a statutory construction which enables a statute to become effective and workable is to be preferred over one leading to an obviously unsupportable and bizarre result. *Kellems* v. *Brown*, 163 Conn. 478, 506; makes clear that "[i]t is well settled that a plaintiff who attacks

a statute on constitutional grounds has no easy burden. As this court said in *Adams* v. *Rubinow,* 157 Conn. 150, 152–53 . . . : 'Because of the separation of powers, one claiming that a legislative enactment is invalid on the ground that it is unconstitutional must establish its invalidity on that ground beyond a reasonable doubt. *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 470 . . . . [W]here a statute reasonably admits of two constructions, one valid and the other invalid on the ground of unconstitutionality, courts should adopt the construction which will uphold the statute even though that construction may not be the obvious one. . . .'" *Kellems* also points out (p. 483) that the burden of proof is on the challenger to prove that the effect or impact of the challenged statute on him adversely affects a constitutionally protected right which he has. This same proposition is aptly stated, as it applies to a criminal statute, in *People* v. *McCabe,* 49 Ill. 2d 338, 340: "The equal-protection clause does not deny the States the power to classify in the exercise of their police power and it recognizes the existence of a broad latitude and discretion in classifying. *(Begich* v. *Industrial Com.* 42 Ill. 2d 32, 36.) If any state of facts may reasonably be conceived which would justify the classification, it must be upheld (see *Begich* v. *Industrial Com.* . . . [supra]). The right of judicial questioning of a classification under the equal-protection clause is thus limited."

In the issue before this court, the Dependency-Producing Drugs Act must be viewed as a viable entity. The portion of §§ 19-480 (a) and 19-481 (a) attacked by the defendant must be read in the light of the definition of a "Narcotic drug" in § 19-443 (30). Here, narcotic drugs are divided into two types—part A, "[m]orphine type," and part B, "cocaine type." It is futile to argue that, because

§§ 19-480 (a) and 19-481 (a) use the nomenclature "narcotic substance" rather than "narcotic drug," this constitutes a fatal variance. It was only by the enactment of Public Acts 1972, No. 278, that this change of name from "drug" to "substance" came into being. Public Act No. 278 redefined, at § 19-443 (30), "Narcotic drug"; the definition formerly read: "includes cocaine-type and morphine-type drugs."[1] Even the defendant's expert did not deny that a drug is a substance.

Reference must be made again to the definition of "Controlled drugs" in § 19-443 (8). Cocaine is clearly included in this subsection, since admittedly it is a drug which has a "stimulant" effect upon the higher functions of the central nervous system. And it can have "a tendency to promote abuse or psychological . . . dependence." The various medical texts and authorities, not excluding the defendant's own witness, Dr. Himmelhoch, attest to this fact.

## VI

In the light of the long history in Connecticut of regulation and control of cocaine because of the potential resultant harm from its abuse, and of the crystal clear objectives of the Connecticut statutes controlling dependency-producing drugs (chapter 359 of the General Statutes), of which §§ 19-480 (a) and 19-481 (a) are a part, the defendant's challenge on constitutional grounds must be held to have failed. He has not sustained his burden of proof to show unconstitutionality.

For the foregoing reasons the defendant's demurrer and/or motion to quash the information filed against him is denied.

---

[1] Public Acts 1973, No. 73-137 § 14, amended § 19-443 (30) to read: " 'Narcotic substance' means any of the following . . . : (A) Morphine type . . . ; (B) cocaine type . . . ."